# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01702-COA

**HOLCOMB, DUNBAR, WATTS, BEST, MASTERS & GOLMON, P.A. F/K/A HOLCOMB DUNBAR, P.A.**  APPELLANT

v.

**400 SOUTH LAMAR OXFORD MAD HATTER PARTNERS, LLC AND BLAKE TARTT III**  APPELLEES

DATE OF JUDGMENT: 10/08/2019
TRIAL JUDGE: HON. FRANK G. VOLLOR
COURT FROM WHICH APPEALED: LAFAYETTE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: MICHAEL N. WATTS
BRADLEY T. GOLMON
ATTORNEYS FOR APPELLEES: JOSEPH T. GETZ
L. CLAYTON CULPEPPER III
NATURE OF THE CASE: CIVIL - CONTRACT
DISPOSITION: AFFIRMED - 05/18/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.  This dispute arises from a commercial lease of office space at 400 South Lamar Avenue, Suite A (the Property), in Oxford, Mississippi. The law firm of Holcomb, Dunbar, Watts, Best, Masters & Golmon, P.A. (Holcomb Dunbar) was the tenant, and 400 South Lamar Mad Hatter Partners, LLC (Mad Hatter) was the landlord. Blake Tartt III is one of the owners and the principal of Mad Hatter.[1]

---

[1] Tartt is a commercial real estate developer and investor who has properties in Oxford and throughout the United States that he maintains through his management

¶2.     Mad Hatter sued Holcomb Dunbar for breach of the office space's lease due to nonpayment of rent, filing a "Complaint in Ejectment, Breach of Contract and Associated Damages" in the Lafayette County Circuit Court.  After discovery, Mad Hatter filed a motion for summary judgment, stating that under the unambiguous terms of the lease, it had no obligation to locate a substitute tenant for Holcomb Dunbar.  Therefore, Mad Hatter contended the firm had no valid claim for default on the lease based on the undisputed material facts, and summary judgment should be granted to Mad Hatter.  The trial court agreed, granted summary judgment in favor of Mad Hatter, and awarded it $133,900 in unpaid rent.  Additionally, the trial court denied Holcomb Dunbar's motion for partial summary judgment and motion to amend its counterclaim, while granting Mad Hatter's motion to quash certain subpoena results.  Holcomb Dunbar's remaining counterclaims went to trial, and the jury found against it.  Holcomb Dunbar appeals the trial court's rulings only on these four motions.

## STATEMENT OF FACTS

¶3.     In November 2009, Holcomb Dunbar entered into a lease with Greenville Compress Company for approximately 6,000 square feet of office space at 400 South Lamar, Suite A. In 2012, the firm exercised its option to renew the lease for another three-year term. Greenville Compress then sold the Property to Mad Hatter.  On September 25, 2015, Tartt and Bradley Best, managing partner and firm administrator at Holcomb Dunbar, met regarding the firm's next lease renewal.  Best informed Tartt that Holcomb Dunbar was in

company New Regional Planning Inc., based in Houston, Texas.

2

the process of constructing a new building in a development called Oxford Commons, and the firm would be moving there in about a year. Tartt and Best discussed various options, including a shorter term lease on the Property at a higher rental rate.[2] In his deposition, Best testified several times that Tartt stated at the meeting that he would try to help find a replacement tenant for the Property in order to let Holcomb Dunbar out of the lease. In that way, he noted Tartt could also lease the Property at a higher rate. Tartt later agreed he said he would help but maintained he was not obliged to do so.

¶4. Holcomb Dunbar decided to renew the lease for another three-year term ending December 31, 2018, even though it planned on vacating the Property in November 2016, over two years prior to the expiration of the lease.[3] As planned, the firm moved to its new building in Oxford Commons in November, but a replacement tenant had not been found. Holcomb Dunbar continued to pay rent for the 400 South Lamar space, now vacant.

¶5. During this time, Best contended that Tartt had made no effort to find a replacement tenant. For the firm's own efforts, it ran an advertisement in a local paper for two weeks; however, it never hired a broker or agent. The firm also complained that Mad Hatter prohibited it from placing advertising banners across the building, but this prohibition was

---

[2] Mad Hatter maintains that Holcomb Dunbar could have opted for a shorter termed lease at $25 per square foot instead of the current $13 per square foot. Holcomb Dunbar's rent, which had stayed the same since 2009, was significantly "under market," with similar properties in the area rented for upwards of $25 per square foot.

[3] Holcomb Dunbar also rented Suite B from Mad Hatter under a separate lease, with options through 2020. This space fronted South Lamar. In October 2016, the firm found a subtenant to lease the space with consent from Mad Hatter.

in accordance with the terms of the lease.[4]  Mad Hatter did allow the firm to place signs in its window, but unfortunately the firm's "front" entrance and windows were located in the back of the building.  Moreover, Tartt claimed that the leads he obtained were unsuitable for a variety of legitimate business reasons.

¶6.    Holcomb Dunbar continued to pay rent on vacant office space and perceived Tartt to be thwarting its efforts to find a replacement tenant.  In February 2017, Tartt put a banner on the front of the Property, advertising its availability for rent and identifying himself as the contact entity.  The firm claimed this was Tartt's first attempt to market the Property since the September 2015 discussion.  In March 2017, Holcomb Dunbar surrendered its key to the Property.  Holcomb Dunbar claims that Tartt "continued to interfere with [its] attempts to find a substitute tenant" or "adequately market" the Property.

¶7.    On April 11, 2017, Best secretly recorded a telephone conversation with Tartt about his progress in finding a replacement tenant for Holcomb Dunbar's remaining lease term.[5] Tartt insisted that he was trying to mitigate the firm's damages and find a replacement tenant.  Best, however, complained that Tartt had not sent him any referrals.  Tartt pointed to the fact Holcomb Dunbar had chosen to extend the lease another three years instead of

_____

[4] Paragraph 15 of the lease on advertising provides, in part:

> That no outside walls, roads or other exterior portion of the Premises or of any buildings or other improvements now or hereafter erected on the Premises shall be used for any advertising purposes whatsoever except for the direct advertising of the Lessee's own business.  All signage must be approved by Lessor.

[5] The telephone call recording was transcribed and is a part of the record.

4

signing a shorter lease at a higher rate, knowing it would be vacating the Property twenty-five months before the lease period ended. Best then requested that Tartt refer any possible replacement tenants to him, but Tartt responded it was not his obligation to do so.

¶8.  Tartt became offended at what he considered an unethical request by Best—if Tartt would give the firm an early release from the lease, in exchange the firm would help Tartt get approval to join two plats in a separate, unrelated matter before the city planning commission on one of Tartt's developments at Oxford Commons. Tartt told Best he considered this offer highly unethical, as the Oxford Commons development was under a different partnership than 400 South Lamar. Tartt told Best "just . . . by saying that you run the risk of losing your law license." Best, however, did not find his suggestion unethical. Tartt then stated, "I just put one guy in jail, okay, for playing games with me."[6]  Best retorted, "Is that a threat?" but Tartt denied it was. The conversation ended seemingly amicable, with Tartt's stating he would send Best any subtenant referrals he received.

¶9.  Nonetheless, Holcomb Dunbar ceased paying rent after April 2017 due to "a combination of abusive and extortive conduct by Mad Hatter," as well as "failure to supply promised leads to potential replacement tenants." Holcomb Dunbar thus deemed Mad Hatter in breach of the lease and its duties to conduct itself in good faith. Tartt also claims Best quit taking his telephone calls.

¶10.  When Holcomb Dunbar became two months behind on rent, on June 29, 2017, Mad

---

[6] Tartt's comment was in reference to his filing charges of felony malicious mischief against a local developer who was accused of destroying one of his property signs that cost $20,000 to replace. In March 2017, the Hotty Toddy News reported the incident on its website.

Hatter, through its management company New Regional Planning, sent the firm a notice of default letter. The letter stated the firm had a default amount of $13,000 in unpaid rent for the months of May and June 2017, and the letter "serves to notify Tenant that pursuant to Section 21 of the Lease . . . this Lease may be forfeited and thereby become null and void at the option of the Lessor . . . ." The letter requested that Holcomb Dunbar contact the property manager about a payment plan. On July 13, 2017, another notice-of-default letter was sent to the firm making a similar request.

¶11. On July 20, 2017, Best sent Tartt a notice of alleged breach of the lease, stating "Holcomb Dunbar considers that its obligations under the lease of Suite A to be fulfilled and concluded" because Mad Hatter "breached its obligations under the Lease and its duty to conduct itself in good faith and to deal fairly with the firm in numerous and repeated respects." In turn, on July 21, 2017, counsel for Mad Hatter sent Holcomb Dunbar a "Three-Day Notice" letter, threatening a lawsuit for legal possession of the premises and past-due rent if the firm did not pay its past-due rent of $19,500 and related fees in three days. Mad Hatter claimed it never forfeited or terminated the lease with Holcomb Dunbar.

¶12. Ultimately, in September 2017, Mad Hatter filed an "Amended Complaint in Ejectment, Breach of Contract and Associated Damages," requesting possession of the premises and damages, a writ of possession, $32,500 in past due rent and fees (as well as accruing rent), and accelerated rent through the end of the lease term. The complaint stated Mad Hatter had "marketed the Premises and is actively searching for a new tenant."

¶13. Holcomb Dunbar filed an answer, asserting the defenses of Mad Hatter's alleged

6

failure to mitigate damages and breach of the covenant of good faith and fair dealing due to Tartt's failure to market the Property and his interference with Holcomb Dunbar's attempts to find a substitute tenant. The firm also counterclaimed for prior material breaches under the lease and other allegations of tortious conduct by Tartt, including illegal threats against Best resulting in intentional infliction of emotional distress and "extortion tactics."[7] Holcomb Dunbar claims Tartt made threats to coerce it into paying rent despite the fact that Mad Hatter breached the lease.

¶14. Holcomb Dunbar filed a motion for partial summary judgment, arguing that because Mad Hatter chose to proceed under Paragraph 21 of the lease (entitled "Default of Rent, Etc."), the lease was null and void thirty days after the date of the demand letter of June 29, 2017. Therefore, at most, Holcomb Dunbar argued it would be responsible only for the three months of unpaid rent before that time (for May, June, and July 2017 at $6,500 per month) for a total of $19,500. Holcomb Dunbar also claimed that since Mad Hatter only sought possession of the space in its notices of default, it was not entitled to further rent after Holcomb Dunbar surrendered possession. Holcomb Dunbar also filed a motion to amend its counterclaim to add libel claims against Tartt relating to two emails—his "extortion

---

[7] In February 2018, Holcomb Dunbar also filed a cross-claim against Tartt for the same claims. The allegations of tortious conduct in the counterclaim and cross-claim relate to the following alleged threats by Tartt in July 2017 made via email to various individuals: filing a Bar complaint against Best for his exchange-of-favors suggestion in the recorded telephone call; publishing the details of Holcomb Dunbar's rental default in *The Oxford Eagle*; and publishing the details of the rent default online through social media. Mad Hatter answered the cross-claim and filed a third-party complaint for tortious interference against Oxford Commons Law Properties LLC, a company comprised of Best and two other partners of the firm, which built its new office building.

7

assertion" in a May 2017 email to Oxford City Planning Director Judy Daniel,[8] and a statement in a July 2017 email to the firm's retired senior attorney, Jack Dunbar, with whom Tartt was friends, that the firm was "acting like dishonest crooks." Mad Hatter filed a motion for summary judgment arguing it was entitled to judgment as a matter of law because Holcomb Dunbar had no valid claim for default under the lease, which had unambiguous terms. Mad Hatter also filed a motion to quash certain subpoena results because they were irrelevant to the claims in the instant action. The subpoena was issued to employees of the Hotty Toddy News requesting records on the story where Tartt filed criminal charges against an Oxford developer. Mad Hatter prevailed on all four motions.

¶15. In granting Mad Hatter's motion for summary judgment, the court agreed that the lease terms were unambiguous. The court found that the lease did not impose a duty upon Tartt to find and refer all inquiries concerning potential sublessors to Holcomb Dunbar. Further, the court found that the lease was never modified by conversations or communications between the parties. Additionally, the court found no breach of the duty of good faith and fair dealing. The court concluded there were no material facts in dispute, and as a matter of law, Holcomb Dunbar breached the lease. As for Mad Hatter's motion to quash, the trial court granted the motion, holding the matters were "irrelevant to the issues pending before the court."

¶16. The trial court also denied Holcomb Dunbar's motion for partial summary judgment,

---

[8] In this email, Holcomb Dunbar claims Tartt accused Best of "extortion" in reference to the exchange-of-favors suggestion by Best during the secretly recorded telephone conversation.

finding the lease was never forfeited or terminated by Mad Hatter. Further, the court found no order of possession was ever entered, which would have had "the effect of terminating any remaining obligations upon Holcomb Dunbar." The trial court also denied Holcomb Dunbar's motion to amend its counterclaim, finding an amendment would cause undue prejudice to Mad Hatter with the trial date only six weeks away.

¶17. Holcomb Dunbar's remaining counterclaims went to trial. Mad Hatter's claim of tortious interference was resolved in favor of Holcomb Dunbar's current landlord, Oxford Commons. The jury resolved the threats and extortion claim in favor of Tartt, denying Holcomb Dunbar recovery for intentional infliction of emotional distress. These claims are not at issue in this appeal.

## STANDARD OF REVIEW

¶18. An appellate court reviews the trial court's grant or denial of summary judgment de novo. *Hubbard v. Wansley*, 954 So. 2d 951, 956 (¶9) (Miss. 2007). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). The evidence will be analyzed in the light most favorable to the nonmoving party. "The moving party has the burden of demonstrating that no genuine issue of material fact[] exists, and the non-moving party must be given the benefit of the doubt concerning the existence of a material fact." *One South Inc. v. Hollowell*, 963 So. 2d 1156, 1160 (¶6) (Miss. 2007) (quoting *Green v. Allendale Planting Co.*, 954 So. 2d 1032, 1037 (¶8) (Miss. 2007)).

"Partial summary judgment is also permissible under our rules, utilizing the same criteria for a grant or denial of a summary judgment and the same standard of review on appeal." *Id.* (citing *Brown v. Credit Ctr. Inc.*, 444 So. 2d 358, 363 (Miss. 1983); M.R.C.P. 56(d)).

**ANALYSIS**

### I. Rent Award

¶19. The trial court's grant of Mad Hatter's motion for summary judgment and denial of Holcomb Dunbar's motion for partial summary judgement had the effect of awarding Mad Hatter past due rent for the remaining eighteen-month term of the lease (May 2017 through December 2018) in the amount of $133,900. In granting summary judgment, the trial court found no material facts in dispute and as a matter of law, Holcomb Dunbar breached the lease. In denying the firm's motion for partial summary judgment,[9] the trial court found that Mad Hatter never forfeited or terminated the lease.

¶20. Holcomb Dunbar argues that this ruling effectively created "new law requiring a tenant to continue paying rent after it relinquishes possession at a landlord's demand." The firm contends this resulted in Mad Hatter's being "awarded a windfall remedy" of the unpaid rent through the remainder of the lease term. Holcomb Dunbar argues both the lease and Mississippi law prohibit Mad Hatter from having possession of the Property and obtaining rent from Holcomb Dunbar.

¶21. Paragraph 21 gives Mad Hatter the ability to terminate the lease and retake possession

---

[9] In its motion for partial summary judgment, Holcomb Dunbar argued that because Mad Hatter proceeded under Paragraph 21, the lease was void thirty days after the date of Mad Hatter's first notice-of-default letter, dated June 29, 2017. Therefore, Mad Hatter could not collect unpaid rent through the end of the lease term.

of the premises if Holcomb Dunbar quits paying rent:

> All covenants and agreements herein made and obligations assumed are to be construed also as conditions and these presents are upon the express condition that *if Lessee should fail to pay when due any one of the aforesaid installments of rent*, or should fail to perform or observe any of the covenants, agreements or obligations herein made or assumed by said Lessee, then and thenceforth, in any of said events, *this Lease may be forfeited and thereby become null and void at the option of the Lessor*, and said Lessor may immediately, or at any time after the breach of any said covenants, re-enter said Premises and building, or any part thereof in the name of the whole, and repossess and have the same as of Lessor's former estate and remove therefrom all goods and chattels not thereto properly belonging and expel said Lessee and all other persons who may be in possession of said Premises and building. *Prior to exercising the rights as described in this provision, the Lessor shall be required to provide a written notice of default to the Lessee and a 30-day opportunity to cure all alleged deficiencies.*

(Emphasis added). Holcomb Dunbar claims the following documents show Mad Hatter requested and obtained possession of the premises under Paragraph 21: the two notice of default letters from June and July 2017 that cite Paragraph 21; the July 21, 2017 letter where Mad Hatter demands legal possession of the premises; Mad Hatter's amended complaint "in Ejectment" and for writ of possession; and Holcomb Dunbar's answer.

¶22. Holcomb Dunbar agrees that the lease and specifically Paragraph 21's terms are unambiguous, but the parties differ on the interpretation of Paragraph 21. Holcomb Dunbar argues that the citation to Paragraph 21 in the default letters had the effect of forfeiting and terminating the lease after the "30-day opportunity to cure," and any further right and obligations of Holcomb Dunbar were null and void.[10] Therefore, Holcomb Dunbar claims

___

[10] At most, Holcomb Dunbar states Mad Hatter might be entitled to three months of unpaid rent for May, June, and July 2017, for a total of $19,500, and not twenty months of rent from May 2017 through December 2018, the end of the lease term.

Mad Hatter activated its option to terminate the lease and take possession by the two default letters.

¶23. We disagree, and find the trial court correctly ruled that the default letters did not amount to Mad Hatter's terminating the lease. The language of Paragraph 21 gives Mad Hatter the "option" to forfeit the lease, stating: "[l]ease *may be forfeited* and thereby become null and void *at the option of the Lessor*." These letters merely gave Holcomb Dunbar notice that rent had not been received, the firm was in default, and it had thirty days to cure. Further, Mad Hatter made no other affirmative action to terminate the lease or oust Holcomb Dunbar from possession. Instead, Mad Hatter chose to require payment of rent under the terms of the lease through December 31, 2018.

¶24. Holcomb Dunbar cites *Adams v. Graham Stave & Heading Co.*, 160 Miss. 266, 135 So. 198 (1931), as controlling. In *Adams*, a lessor sued a lessee for failure to pay rent under a lease where payment of rent was due each year in advance. *Id.* at 198. The lessee had subleased the property. *Id.* at 199. When the lessee did not pay its annual rental payment, the lessor sent a letter to the lessee stating "you will here take notice that you have forfeited your contract, in not complying therewith." *Id.* The lessee seemed "to have accepted this letter as release of the lease" even though the lease did not provide for forfeiture for nonpayment of rent. *Id.* The chancery court held that the lessor had no grounds for suit because the lessor terminated the lease and the lessee acquiesced to it. *Id.* Therefore, the lease ceased to operate after receipt of the lessor's letter terminating the lease. *Id.* The Mississippi Supreme Court affirmed, stating:

12

> There was distinctly a failure of consideration brought about by the act of the lessor. He could not forfeit the lease and terminate it and have the use of the premises, and receive the compensation for the rent both. He had a right to elect either one of the two courses of conduct and action. When he chose to terminate the lease, and that choice was acquiesced in by the lessee, then his right to recover rent for the leased premises ceased.

*Id.* Under *Adams*, Holcomb Dunbar argues that Mad Hatter had two options when faced with the firm's failure to pay rent: Mad Hatter could have left Holcomb Dunbar in possession of the premises and sued for rent or terminated the lease and expelled the firm. Holcomb Dunbar argues that *Adams* applies to both the default and demand letters before litigation, and the legal averments in the pleadings after litigation commenced. Holcomb Dunbar further argues that the trial court improperly ignored the import of these letters and pleadings.

¶25. We find *Adams* distinguishable. There, the lessor affirmatively terminated the lease through a letter to the lessee, who acquiesced. Here, there was no termination and acquiescence. Mad Hatter's default letters did not expressly terminate the lease, but instead gave Holcomb Dunbar notice Mad Hatter had the option to do so if the firm did not pay the rent. Mad Hatter never exercised this option.

¶26. Holcomb Dunbar notes that this commercial lease is unusual because it does not contain a clause accelerating rent payments not yet due. The firm explains such a clause would allow Mad Hatter to declare a default, then accelerate the obligation, at which time full rent would be due from the firm due to default; Mad Hatter could then terminate the lease and expel Holcomb Dunbar. The firm cites *Frey v. Abdo*, 441 So. 2d 1383, 1385 (Miss. 1983), for the proposition that in the absence of an acceleration clause, upon default

13

by the tenant for failure to pay rent, the landlord must generally wait until each rental payment is due before suing for it.

¶27. Holcomb Dunbar also points out that the basis of Mad Hatter's complaint was "ejectment and possession." Holcomb Dunbar claims it acquiesced in possession by surrendering the property's key in March 2017, and in its answer, once litigation commenced.[11] Therefore, Holcomb Dunbar reasons the lease was forfeited, and no further relief, such as unpaid rent, was available to Mad Hatter. However, Mad Hatter sued on multiple grounds with numerous causes of actions and remedies. The fact Mad Hatter sued for ejectment does not relieve Holcomb Dunbar of its contractual obligation to pay rent. Moreover, Mad Hatter never ousted the firm from the Property.

¶28. Finally, Holcomb Dunbar waived any election-of-remedies affirmative defense because it was not specifically pleaded in its answer. Mississippi Rule of Civil Procedure 8(c) "specifically requires that, in pleading to a preceding pleading, a party shall set forth affirmatively certain listed defenses" which includes "any other matter constituting an avoidance or affirmative defense." Therefore, "generally, if a party fails to raise an affirmative defense in its original answer, the defense will be deemed waived." *Hutzel v.*

---

[11] In Paragraph 7 of the answer, Holcomb Dunbar admitted it vacated the premises. Holcomb Dunbar claims the statement in its answer is a "judicial admission," which is a "formal concession[] in [a] pleading[] or [a] stipulation[] by a party or counsel that [is] binding on the party making them." *Elliott v. AmeriGas Propane L.P.*, 249 So. 3d 389, 395 (¶25) (Miss. 2018). It "has the effect of withdrawing a fact from contention." *Id.* Holcomb Dunbar, of course, vacated the premises in November 2016, seven months before the default letters were sent. Similarly, the key was surrendered in March 2017, three months before the default letters were sent. Accordingly, it is hard to see how either admission could constitute "acquiescence" to Mad Hatter's demands.

14

*City of Jackson*, 33 So. 3d 1116, 1119 (¶12) (Miss. 2010) (citing *Pass Termite and Pest Control Inc. v. Walker*, 904 So. 2d 1030, 1033 (¶10) (Miss. 2004)).

¶29. In conclusion, the trial court did not err in finding Holcomb Dunbar breached the lease, and Mad Hatter was properly awarded past due rent in the amount of $133,900.

## II. Material Breaches

¶30. Holcomb Dunbar argues that in granting Mad Hatter's motion for summary judgment, the trial court erred in ruling that Mad Hatter did not breach the lease or its duty of good faith and fair dealing, thereby finding there was no requirement Mad Hatter or Tartt find or refer potential sublessees to Holcomb Dunbar. The firm claims there is a genuine issue of material fact regarding Mad Hatter's "long train of abuses" and whether, taken together, they constitute breach of the lease, which would thereby have alleviated the firm of any past-due rent obligations.

¶31. Holcomb Dunbar asserts that Mad Hatter breached its duty of good faith and fair dealing. "All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992). The duty is described as follows:

> [C]ourts have often supplied a term requiring both parties to a contract to exercise what is called "good faith" or sometimes "good faith and fair dealing." This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.

15

*Id.* (quoting E. Allan Farnsworth, *Contracts* § 7.17, at 526-27 (1982)). "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.* (citing Restatement (Second) of Contracts § 205, at 100 (1979)).

¶32. Holcomb Dunbar argues that Mad Hatter failed to act in good faith when dealing with the firm and efforts to sublease the property. Holcomb Dunbar complains that Mad Hatter "commandeered all interest in the property," assuring the firm it would "share all leads" but never doing so. The firm also claims Mad Hatter thwarted its efforts to find a new tenant as well.

¶33. The record shows Tartt received several contacts about leasing the space, mostly in the summers of 2016 and 2017, but none were appropriate for a variety of reasons. The interested parties represented businesses such as restaurants, a brew pub, retail clothing, and an appraisal group. In Tartt's deposition, he discussed why these leads did not work out. Tartt explained the difficulty he encountered in finding a tenant interested in signing a short-term lease of approximately twenty months for a 6,000 square foot space with no frontage on South Lamar.[12] A regional real-estate broker out of Texas contacted Tartt twice in July and September 2016 about frontage space "on the square" for retail apparel. However, one client was more interested in space directly on the square (which the Property is not), and

---

[12] In October 2016, Holcomb Dunbar found a subtenant for the frontage Suite B, leasing it to a women's retail clothing shop. Before that time, Tartt was looking for a tenant for both Suites A and B.

16

the other client passed on the overall Oxford market. Regarding another retail lead, Tartt discussed the conflict of having two similar retailers competing against one another after Holcomb Dunbar subleased Suite B to a women's retail clothing shop. He also mentioned the "build-outs" required for the property to be used as a restaurant or brew pub, which would need to be funded and which would be impractical for a short-term lease. Tartt testified that he told Best that potential replacement tenants, in particular retailers, "kept turning [the space] down," and he had been unable to find a replacement tenant.

¶34. Holcomb Dunbar, however, claims Mad Hatter purposefully rejected the leads to make more money. When Holcomb Dunbar moved out of the Property in November 2016, it had twenty-five months left on its lease at $13 per square foot. The firm claimed that since this rental rate was well below the market rate,[13] Mad Hatter did not have an incentive to help Holcomb Dunbar find a subtenant to finish its lease term because it could obtain a higher rate of return per square foot by finding another tenant for itself. However, this same argument could be considered as an incentive for Mad Hatter to find a replacement tenant at a higher rate and let Holcomb Dunbar out of its lease. Holcomb Dunbar also states Mad Hatter lacked incentive because it could "have its cake and eat it too" by the firm's continuing to pay rent after it had moved out (which it did for five months).

¶35. Holcomb Dunbar cites *Nisby v. Sheskey*, 2007 Mass. App. Div. 103 (2007), an unpublished opinion from Massachusetts, as support for its contention that Mad Hatter had an obligation to present possible subtenants to the firm for approval. Holcomb Dunbar

---

[13] Tartt eventually rented the space for $25 per square foot but offered as much as $38 per square foot to a potential tenant for a smaller space which included frontage.

claims the landlord's conduct in *Nisby* is "identical" to that of Mad Hatter and violated the covenant of good faith and fair dealing. In *Nisby*, the landlord sued a commercial tenant for breaching the lease for failure to pay rent. *Id.* at *1. The tenant counterclaimed, alleging the landlord breached the lease for refusing to allow the tenant to sublet the premises. *Id.* After a jury-waived trial, the judge found the landlord's outright refusal to honor the lease provisions allowing subletting, and the landlord's interference with the tenant's attempts to secure a subtenant, constituted material breaches of the lease, and excused the tenant from any further contractual duty. *Id.* The trial court found "the landlord was no neophyte and was well-inured to the sometimes 'rough and tumble world of commerce.'" *Id.* at *2. The landlord either rejected inquiries about renting the premises or did not refer them to the tenant. *Id.* at *3. The appellate court held this refusal "abnegated [the tenant's] right to make an informed judgment" and to present an offer to the landlord, even if the landlord refused permission. *Id.* The trial court found "[t]he landlord's actions smacked of" extortion. *Id.* The appellate court affirmed the trial court's finding in favor of the tenant's counterclaim. *Id.* at *4.

¶36.   We find *Nisby* neither controlling nor persuasive. Mad Hatter did not refuse to allow Holcomb Dunbar to sublet the premises, unlike in *Nisby*. In fact, Mad Hatter had approved Holcomb Dunbar's subletting Suite B.

¶37.   We agree with the trial court there is no genuine issue of material fact that Mad Hatter breached the terms of the lease or its duty of good faith. There is no provision in the lease obligating Mad Hatter to find a subtenant for Holcomb Dunbar. While Tartt offered to

18

assist, he was unsuccessful. Further, just because he did not actively share all of the possible tenant contacts with Holcomb Dunbar does not mean he was not working toward the same common goal as the firm of finding a tenant. The record shows Tartt obtained several leads but none were suitable due to the location or the term remaining on the lease.

¶38. Further, Holcomb Dunbar was not actively attempting to find itself a subtenant. The firm did not hire a broker or real estate agent, or advertise the property online; it only ran a two-week advertisement in a local newspaper. Once Holcomb Dunbar moved out of the Property in November 2017, Best became highly motivated in finding a subtenant because the firm was paying rent on two properties. Yet, the firm had made the decision back in September 2015 to renew the lease agreeing to pay $6,500 per month for another three-year term, knowing that it intended to vacate the premises before the lease expired. When Tartt was unsuccessful finding a tenant, Best began accusing him of hiding prospects, but there was no evidence presented of this contention.

¶39. Holcomb Dunbar also claims Mad Hatter thwarted its effort to find a subtenant by preventing it from hanging a banner on the side of the building that faced South Lamar Avenue, even though Paragraph 15, the lease's advertising clause, prohibits tenants from "any advertising purposes whatsoever" on the exterior of the premises. After this prohibition, Holcomb Dunbar then complained Mad Hatter "seized the opportunity solely for itself," by placing banners on the side of the building with only its contact information, while obscuring Holcomb Dunbar's firm name. We find this argument without merit. Mad Hatter did allow Holcomb Dunbar to place a sign in its window near the firm's entrance at

the rear of the building. This incident, however, shows the parties were not working together to find a subtenant. "[A] party cannot violate the implicit duty of good faith by exercising a right made explicit in the contract." *Crosby Mem'l Hosp. v. Abdallah*, 48 F. App'x 102, 2002 WL 31016466, at *13 (5th Cir. 2002) (citing *Am. Bankers' Ins. Co. of Fla. v. Wells*, 819 So. 2d 1196, 1206 (Miss. 2001)).

¶40. Finally, Holcomb Dunbar contends Mad Hatter breached at least four specific provisions of the lease—including quiet possession (Paragraph 8), advertising (Paragraph 15), subletting (Paragraph 23), and parking spaces (Paragraph 33)—which alleviated it of any further rent obligations. Holcomb Dunbar argues there are genuine issues of material fact regarding these alleged breaches that should be presented to a jury. We disagree.

¶41. Holcomb Dunbar's breach allegations are all either immaterial or occurred prior to the final term of the lease. In granting summary judgment, the trial court found the issues regarding parking spaces were not material to the lease and arose during a prior lease term. Further, any parking issues were not raised when Holcomb Dunbar signed another renewal of the lease. Holcomb Dunbar also lists other alleged "breaches and abuses," mostly in reference to the telephone conversation between Best and Tartt in April 2017 that Best secretly recorded.[14] The trial court properly found these statements immaterial as to breach of the lease, and any "[r]eferences to other conversations or communications between the

---

[14] Specifically, Holcomb Dunbar alleges that Tartt threatened to arrest Best, Tartt accused the firm of extortion in an email, Tartt threatened to file a Bar complaint against Best, and Tartt emailed Jack Dunbar stating the firm was acting "like dishonest crooks." After a jury trial, Holcomb Dunbar was denied any relief related to these allegations and its claims of intentional infliction of emotional distress and tortious interference.

parties are not conditions of and do not modify the lease."

¶42.　The trial court did not err in finding Holcomb Dunbar's claims of material breach were either immaterial or occurring prior to the most recent lease renewal.

### III.　Failure to Mitigate

¶43.　Holcomb Dunbar argues there is a genuine issue of material fact as to whether Mad Hatter attempted to mitigate its damages. The firm claims that the trial court improperly prevented Holcomb Dunbar from presenting a failure-to-mitigate defense to the jury in response to Mad Hatter's primary claim for rent. Holcomb Dunbar claims it presented sufficient evidence of Mad Hatter and Tartt's failure to mitigate to overcome summary judgment.

¶44.　Holcomb Dunbar argues that Mad Hatter had an obligation to mitigate, and made promises to do so, but instead took "extraordinary steps of secreting away these leads" so that Holcomb Dunbar could not sublease the property at their lower rental rate. Holcomb Dunbar contends evidence showed numerous entities expressed interest in the Property, but none were shared with the firm. Further, Holcomb Dunbar presented evidence of a "scheme" by Mad Hatter intentionally to leave the space empty during the legal dispute.[15] The firm contends that the fact Mad Hatter left the Property vacant from the time the firm moved out until the expiration of the lease creates a jury question on Mad Hatter's failure to mitigate.

---

[15] In an April 2017 email exchange, Tartt did explain to a client that the property could not be leased to a new tenant because it was "in litigation." Holcomb Dunbar notes Raymond James and a wine bar ultimately moved into the space, but it was after the expiration of the firm's lease.

21

¶45. While Holcomb Dunbar claims it raised the above evidence in response to Mad Hatter's motion for summary judgment, it did not, however, raise mitigation as an argument in its response. Holcomb Dunbar admitted at oral argument before this Court that it never raised mitigation as a specific issue for the trial court to consider at the summary-judgment stage. Holcomb Dunbar explains that it made that decision because it deemed mitigation to be an affirmative, "fact based" defense for a jury to decide. However, it was incumbent on Holcomb Dunbar, as the party against whom a motion for summary judgment had been filed, to prove that there was a genuine issue of material fact for trial. This it did not do. Holcomb Dunbar never argued Mad Hatter was not entitled to judgment as a matter of law because there was a genuine issue of material fact regarding Mad Hatter's failure to mitigate.[16] Accordingly, the issue is waived.[17] We cannot hold the trial court in error for a matter not presented to it. *Southern v. Miss. State Hosp.*, 853 So. 2d 1212, 1214-15 (¶5) (Miss. 2003).

¶46. The separate opinion claims the trial court erred in granting summary judgment regarding mitigation of damages and erroneously awarded Mad Hatter the amount of $133,900. The opinion argues that because there was a genuine issue of material fact on this

---

[16] Not surprisingly, the trial court did not address whether Mad Hatter had a duty to mitigate. The closest the trial court came to making any such finding was ruling that there was no contractual provision in the lease that imposed a duty on the lessor to find and refer potential sublessors to the lessee and its conclusion that conversations and communications between the parties did not modify the lease, as under the specific terms of the lease, any modifications had to be in writing.

[17] *Accord Stewart v. Bridge Props. LLC*, 62 So. 3d 979, 988 (¶27) (Miss. Ct. App. 2010) (Tenant's mitigation argument was procedurally barred on appeal because it failed to offer authority or substantive argument on the issue.). In our case, the argument was not made below; therefore, it is not proper on appeal.

22

issue and because Holcomb Dunbar raised mitigation as an affirmative defense in its answer, the firm should have been allowed to present evidence on mitigation at trial. We disagree. Again, as stated earlier, the firm failed to meet its burden as the party against whom a motion for summary judgment was filed by failing to present this issue for the trial court's consideration. Raising the issue as an affirmative defense in its answer cannot be considered the same as raising it as a response to a motion for summary judgment. "[O]nce a party files a motion for summary judgment, *the party opposing the motion 'may not rest upon the mere allegations or denials of his pleadings*, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" *Hartford Cas. Ins. Co. v. Halliburton Co.*, 826 So. 2d 1206, 1215 (¶31) (Miss. 2001) (emphasis added) (quoting *MST Inc. v. Miss. Chem. Corp.*, 610 So. 2d 299, 304 (Miss. 1992)). Here, while certain evidence was in the record upon which a mitigation argument could have been made, the argument was not made.

¶47. The separate opinion further claims that a duty to mitigate damages should be implied and imposed in every contract by operation of law, especially breach of commercial leases, even though Mississippi has no reported cases regarding a landlord's duty to mitigate a commercial lease.[18] We decline to address this issue or the need to overrule caselaw because we find the matter waived.

### IV. Mad Hatter's Motion to Quash

---

[18] Mad Hatter cites *Alsup v. Banks*, 68 Miss. 664, 9 So. 895 (1891), for this proposition, but it involved a residential lease. The dissent cites only one case from New Jersey, *Fanarjian v. Moskowitz*, 568 A.2d 94, 98-99 (N.J. Super. Ct. App. Div. 1989), making the commercial/residential distinction it would have this Court adopt.

¶48.    Holcomb Dunbar claims error with the trial court's grant of Mad Hatter's motion to quash the firm's request for records related to a story posted on the Hotty Toddy News website in March 2017.  The story relayed how Tartt had filed felony malicious mischief charges against an Oxford developer who destroyed one of his property signs that would cost between $20,000 and $25,000 to replace.  Both Tartt and the individual were developers in the Oxford Commons area.  In its motion, Mad Hatter argued the requested information "serves no purpose towards the merits" of this case's claims, and instead is intended to harass and embarrass" Tartt.  The trial court granted the motion, finding the information sought was "irrelevant to the issues pending before the Court."  We agree.

¶49.    The standard for reviewing the trial court's discovery decisions is abuse of discretion. *Long v. Vitkauskas*, 287 So. 3d 171, 175 (¶14) (Miss. 2019).  The Mississippi Supreme Court has applied a de novo standard to review motions to quash subpoenas where the underlying issue was one of law such as personal jurisdiction (*Burch v. Land Partners L.P.*, 784 So. 2d 925, 927 (¶7) (Miss. 2001)) or statutory interpretation (*State v. Baptist Mem'l Hosp.-Golden Triangle*, 726 So. 2d 554, 557 (¶9) (Miss. 1998)).  *See St. Luke Inst. Inc. v. Jones*, 216 A.3d 49, 53 (Md. 2019) (holding that ordinarily the standard for reviewing a trial court's ruling on a motion to quash a subpoena is an abuse of discretion, but where the underlying issue involves a matter of law the standard of review is de novo).  Here, the underlying issue was one of normal discovery practice; therefore, the standard of review is abuse of discretion.  Holcomb Dunbar argues the information sought by subpoena provides context and credibility to Tartt and Best's April 2017 telephone conversation secretly

24

recorded by Best, where Best claims Tartt threatened him with arrest. During the call, Tartt stated, "I just put one guy in jail, okay, for playing games with me." Tartt admitted he was referring to the incident in the news article. Holcomb Dunbar also claimed this information would further its claims that Mad Hatter materially breached the lease, as well as the implied covenant of good faith and fair dealing and the express covenant of quiet enjoyment and possession. However, this matter had nothing to do with the lease dispute between Holcomb Dunbar and Mad Hatter. Moreover, further context to the secretly recorded call was not needed; it was thoroughly discussed in both Tartt's and Best's depositions, and a transcript of the entire call was entered into evidence. We find no error with the trial court's grant of Mad Hatter's motion to quash because the information sought was irrelevant to the pending issues before the trial court.

## V.     Holcomb Dunbar's Motion to Amend

¶50.    Holcomb Dunbar claims the trial court erred in denying its motion to amend its counterclaim by adding claims of libel and libel per se against Tartt. The motion asserted the following two alleged instances of libel: a May 2017 email to Oxford City Planner Daniel in which Tartt had allegedly accused Best of the felony of "extortion"; and a July 2017 email to Jack Dunbar, one of the firm's retired senior attorneys, in which Tartt stated that the firm's partners were "acting like dishonest crooks."

¶51.    The trial court denied the motion, finding that the time of its filing, approximately six weeks before trial, would unduly prejudice Mad Hatter. The standard of review for ruling on a motion to amend a complaint is an abuse of discretion. *Moeller v. Am. Guar. and Liab.*

25

*Ins. Co.*, 812 So. 2d 953, 961 (¶26) (Miss. 2002) (citing *Church v. Massey*, 697 So. 2d 407, 413 (Miss. 1997)).   On appeal, Holcomb Dunbar argues these emails further their libel claims as the emails are "clearly defamatory."   We find the trial court did not abuse its discretion in denying the motion to amend.

¶52.   Not only was the motion to amend for additional claims filed very close to the time of trial, but the libel claims Holcomb Dunbar sought to add were barred by the statute of limitations, which is "within one (1) year next after the cause of such action accrued."  Miss. Code Ann. § 15-1-35 (Rev. 2019).   Mad Hatter states, and Holcomb Dunbar does not dispute, that the two emails that served as the initial basis for the motion to amend had been in the possession of the firm for over a year prior to the motion to amend; therefore, the libel claims related to the motion to amend are time barred.   Accordingly, the trial court did not err in denying Holcomb Dunbar's motion to amend.

**CONCLUSION**

¶53.   The trial court did not err in granting Mad Hatter's motion for summary judgment. There was no genuine issue of material fact, and Mad Hatter was properly awarded a judgment of $133,900 for past due rent for the remaining eighteen months of the lease. Further, the trial court did not err in granting Mad Hatter's motion to quash certain subpoena documents and denying Holcomb Dunbar's motion to amend its counterclaim.  Accordingly, the trial court's judgment is affirmed.

¶54.   **AFFIRMED.**

**CARLTON, P.J., WESTBROOKS, McDONALD AND EMFINGER, JJ., CONCUR.   WILSON, P.J., CONCURS IN PART AND DISSENTS IN PART**

**WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY McCARTY AND SMITH, JJ. GREENLEE, J., NOT PARTICIPATING.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶55.   I concur with the majority that the trial court was correct in granting summary judgment against Holcomb Dunbar for breach of the commercial lease.  I also understand how the majority reached the conclusion that Holcomb Dunbar waived the issue of mitigation of damages when it failed to include it in its response to a motion for summary judgment.  That motion sought to have the trial court determine as a matter of law, that Holcomb Dunbar breached a contract and requested the court to assess the resulting damages.  Holcomb Dunbar did not respond with a mitigation-of-damages argument.  Rather, it responded with the argument that damages should be decided by a jury in that Mad Hatter violated the implied duty of good faith and fair dealing.  However, I believe a duty to mitigates damages should be implied in every contract by operation of law just as the duty of good faith and fair dealing is implied.  The trial court held that no provision of the contract in question imposed a duty on Mad Hatter to "locate" or "refer" new tenants which, if it had done so, would certainly have mitigated its damages. The trial court then summarily determined damages in its order granting summary judgment.  Further, I would find there were genuine issues of material fact as to damages and the trial court erred in summarily granting damages to Mad Hatter in the amount of $133,900.00.

¶56.   Mad Hatter cites the case *Alsup v. Banks*, 68 Miss. 664, 9 So. 895, 895 (1891), as authority that no duty to mitigate exists in commercial lease agreements.  No doubt, the

*Alsup* case having been decided in 1891, is representative of the traditional view, but that was not a commercial lease. While a few courts, including Mississippi, "still adhere to the traditional rule . . . that a landlord is under no duty to mitigate damages, that number has steadily dwindled . . . as more and more courts have adopted the modern—and now majority—view that a landlord must attempt to mitigate damages following a tenant's abandonment of the leased premises." 72 Am. Jur. Proof of Facts 3d 155 § 2 (April 2021 Update). Apparently, Mississippi is one of only five states that still follows the traditional and antiquated rule that landlords have no duty to mitigate in property residential leases. *Id.*; *see Alsup*, 68 Miss. 664, 9 So. at 895. As previously stated, *Alsup* involved a residential lease. *Alsup*, 68 Miss. 664, 9 So. at 895. In the *Alsup* case, while the court held that the landlords had no duty to mitigate damages, there was little doubt that the landlords "did all they could to obtain the best terms in renting to others[.]" *Id.* To reiterate, there are no reported cases in Mississippi regarding a **commercial** landlord's duty to mitigate, which is one of the very issues in this appeal. *See generally Austin Hill Country Realty Inc. v. Palisades Plaza Inc.*, 948 S.W.2d 293, 297-99 (Tex. 1997) (discussing the rationale for adopting a duty to mitigate). While this Court cannot overrule *Alsup* and its application to residential leases, I would distinguish it and decide Mississippi law does impose a duty to mitigate damages in a breach of a commercial lease. The mitigation of damages rule has been invoked in many other contract and tort situations.[19]

---

[19] *See, e.g., Frierson v. Delta Outdoor Inc.*, 794 So. 2d 220, 225 (¶14) (Miss. 2001); *Ga. Pac. Corp. v. Armstrong*, 451 So. 2d 201, 206 (Miss. 1984); *R. McKnight & Son v. C&I Ent.*, 100 So. 3d 1022, 1031 (¶17) (Miss. Ct. App. 2012).

¶57. The trial court found that the provisions of the commercial lease contract did "not impose a duty upon the lessor to find or refer potential sublessors to the lessees." I agree with the trial court that Mad Hatter had no duty to seek out and attempt to locate new tenants. I disagree that Mad Hatter should be cloaked as having no duty to refer potential new tenants who it became aware of or attempt to lease the subject property to those potential tenants in an effort to mitigate its damages. The trial court's summary judgment ruling effectively prevented Holcomb Dunbar from presenting evidence as to mitigation, even though it was listed as an affirmative defense in their answer.[20] This ruling directly affected the amount of damages Holcomb Dunbar was ordered to pay to Mad Hatter.

¶58. In the interest of justice and the efficient resolution of contract disputes, I believe the law should always encourage and require mitigation of damages. To hold otherwise invites escalating civil conflicts, allows parties the power to excessively punish a breaching party, encourages parties to leave viable commercial properties abandoned for long periods of time, and promotes the potential of a party to manipulate and abuse the justice system by

---

[20] The majority asserts that Holcomb Dunbar waived this affirmative defense when it was not argued in its response to Mad Hatter's motion for summary judgment. That motion asked the trial court to determine if Holcomb Dunbar breached the contract as a matter of law and award damages in the amount of $133,900. Holcomb Dunbar did allege facts indicating Mad Hatter violated the implied covenant of good faith and fair dealing and that those violations lessen its potential damages, but it never asserted the legal theory of mitigation of damages. Nevertheless, the trial court ruled no duty existed which prevented that evidence from being presented to a jury. Because it was an affirmative defense raised in the answer to the lawsuit filed by Mad Hatter, the issue was not waived if a jury trial occurred on damages. Holcomb Dunbar repeatedly and consistently argued that there were genuine issues of material fact as to damages and the issue of damages was a question for the jury. *See Harrison v. Walker*, 91 So. 3d 41, 48 (¶25) (Miss. Ct. App. 2011) (citing *Causey v. Sanders,* 998 So. 2d 393, 409 (¶54) (Miss. 2008)).

29

sitting idly by while the tab for damages runs. Apparently, forty-two states have held that a landlord does have a duty to mitigate when a property has been abandoned in violation of a lease. In addressing this issue, the Supreme Court of Texas stated that "[f]orty-two states and the District of Columbia have recognized that a landlord has a duty to mitigate damages in at least some situations: when there is a breach of a residential lease, a commercial lease, or both." *Austin Hill Country Realty Inc.*, 948 S.W.2d at 296 n.1. In fact, some states have held that a landlord must act in a reasonable manner in their efforts to mitigate damages once a property is abandoned and a breach of contract has occurred. 72 Am. Jur. Proof of Facts 3d 155 § 7 n.3 (collecting cases). In *Fanarjian v. Moskowitz*, 568 A.2d 94, 98-99 (N.J. Super. Ct. App. Div. 1989), the New Jersey Superior Court succinctly held:

> In our view, reason and logic, as well as public policy, support the extension of the mitigation of damage requirements to commercial lease settings. Such policy considerations include denying the injured party the opportunity to sit idly by and exacerbate damages; discouraging economic and physical waste; and society's interest in encouraging that vacant property be put to a practical use as soon as possible.

I do not believe courts should sanction a party's failure to mitigate damages any more than it should deny damages on the original breach of the contract. The two are directly related and should be fairly litigated between the parties.

¶59. Here, in April 2017, Tartt, one of the owners of Mad Hatter, informed a potential new lessee that the property in question could not be leased to a new tenant because it was "in litigation." On appeal, Mad Hatter argues that it had no "affirmative duty to mitigate damages." If Tartt is right that he has no duty to mitigate under our law and he can refuse a sublease without legal consequence, then Mississippi would stand contrary to forty-two

30

other states that have decided under modern landlord tenant law that such an approach is antiquated and not supported by modern public policy considerations. Essentially, it appears from that email that Mad Hatter did exactly what courts in forty-two states have said a landlord cannot do, at least without legal consequence.

¶60.   In summary, I would find the modern and overwhelmingly majority view of states concerning mitigation of damages for leases more legally sound and supported by better public policy than those fashioned in 1891 and hold that Mad Hatter had a duty to mitigate. I would hold that the trial court was in error in granting summary judgment to the extent it prevented mitigation evidence from being presented to the jury.  Accordingly, I concur in part and dissent in part.

**McCARTY AND SMITH, JJ., JOIN THIS OPINION.**